UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **LEXINGTON INSURANCE COMPANY** <br> **Plaintiff** | * <br> * <br> * | CIVIL ACTION NO. 11-1865 <br><br> SECTION "R"(3) |
| **VERSUS** | * <br> * | <br> JUDGE SARAH S. VANCE |
| **ST. BERNARD PARISH GOVERNMENT** <br> **Defendant** | * <br> * <br> * <br> * | <br> MAGISTRATE JUDGE <br> KNOWLES |

* * * * * * * * * * * * * * * * * * * *

### PRETRIAL MEMORANDUM BY LEXINGTON INSURANCE COMPANY

Plaintiff, Lexington Insurance Company ("Lexington"), respectfully files this Pretrial Memorandum in connection with the above captioned matter.

**I. FACTS AND BACKGROUND.**

As provided in the parties' Pretrial Order, there are no contested issues of fact in this case. In February of 2008, the St. Bernard Parish Government ("SBPG") condemned a number of structures within the parish that it felt had failed to meet the minimum housing standards mandated by the St. Bernard Parish Code of Ordinances. *See* Complaint for Declaratory Judgment at ¶ 8 and Defendant's Answer, admitting these allegations, at ¶ VIII. The condemnation identified those structures within St. Bernard Parish that posed a threat to the health and/or safety of the residents of the Parish, aiming to facilitate the rehabilitation of those properties for which it was possible while removing those structures that could not be rehabilitated. *See* Complaint for Declaratory Judgment at ¶ 9 and Defendant's Answer, admitting these allegations, at ¶ IX.

On or about February 26, 2009, a lawsuit was filed in Louisiana state court against SBPG by numerous plaintiff property owners, styled *Nolan Estopinal, et al v. Parish of St. Bernard, et*

*al.*, 34th Judicial District Court of St. Bernard Parish, Louisiana, Case No. 113,313 (the "*Estopinal* Litigation"). The currently controlling pleading, the Fourteenth Amended and Supplemental Petition, was filed in the *Estopinal* litigation on October 11, 2010. In addition to the *Estopinal* Litigation, other suits have been filed against SBPG seeking similar relief (collectively the "Underlying Lawsuits").[1]

In the *Estopinal* Litigation, a minimum, seventy three (73) named plaintiffs and fifty-seven (57) properties are identified. Each plaintiff claims his property was demolished and/or damaged by SBPG over the course of 2008 and 2009. *Id*. Seventy Plaintiffs assert claims for the

---

[1] Based on information or belief, at least nine (9) other suits have been filed against SBPG alleging similar facts. In addition to *Estopinal*, the Underlying Lawsuits of which Lexington has received notice include, but is not limited to, the following cases:

*Jerry Bohannan and Janet Bohannan v. St. Bernard Parish Government, Barowka and Bonura Engineers and Consultants, LLC, Unified Recovery Group, LLC and ABC Construction*, Case No. 112-469, pending in the 34th Judicial District Court for the Parish of St. Bernard.

*Allan C. Reichert and Kathy C. Reichert v. Parish of St. Bernard, Unified Recovery Group, LLC and Barowka and Bonura Engineers & Consultants, LLC*, Case No. 115-192, pending in the 34th Judicial District Court for the Parish of St. Bernard.

*Vicki S. Abdo, Velicity Abdo, and Velina Abdo v. St. Bernard Parish Government*, Case No. 113-164, pending in the 34th Judicial District Court for the Parish of St. Bernard.

*Martin Cross, Jr. v. St. Bernard Parish Government, Unified Recovery Group LLC, Asplundh Construction Corp. and Barowka and Bonura Engineers and Consultants, LLC*, Case No. 115-487, pending in the 34th Judicial District Court for the Parish of St. Bernard.

*Real Investments of New Orleans, LLC v. St. Bernard Parish Government, Unified Recovery Group LLC, Asplundh Construction Corp. and Barowka and Bonura Engineers and Consultants*, Case No. 115-268, pending in the 34th Judicial District Court for the Parish of St. Bernard.

*Curtis Pitre v. The Parish of St. Bernard, St. Bernard Parish Government, Barowka and Bonura Engineers and Consultants, LLC and Unified Recovery Group, LLC*, Case No. 115-142, pending in the 34th Judicial District Court for the Parish of St. Bernard.

*Oren M. Welborn v. St. Bernard Parish Government*, Case No. 11-532, pending in the United States District Court for the Eastern District of Louisiana.

*Numa Jones and Jill Jones v. St. Bernard Parish Government, Unified Recovery Group, LLC, Asplundh Construction Corp, and Barowka and Bonura Engineers and Consultants*, Case No. 115, 269, pending in the 34th Judicial District Court for the Parish of St. Bernard; and

*Judy Henderson v. St. Bernard Parish Government*, Case No. 113,162, pending in the 34th Judicial District Court for the Parish of St. Bernard.

complete demolition of their property. Two Plaintiffs claim that their property was partially destroyed by the acts of SBPG, as opposed to being completely demolished. Notably the alleged demolitions or partial destruction did not take place at one specific time. Instead, the condemnation and demolition actions took place over the course of more than a year, with different properties located in different places being demolished and damaged at different dates and times.[2] Furthermore, it is undisputed that the value of each property demolished or damaged is less than $250,000.00.

SBPG seeks coverage under the Lexington Policies for the claims asserted in the Underlying Lawsuits. However, as the alleged demolition and/or property damage claimed by

---

[2] For the claims associated with properties allegedly demolished at various times in December of 2008, see ¶¶ 2(41), (49), (52).

For the claims associated with properties allegedly demolished at various times generally in 2009, see ¶¶ 2(14), (32)-(36), (64)-(65), (70).

For the claims associated with properties allegedly demolished at various times in January of 2009, see ¶¶ 2(5)-(11), (30), (48).

For the claims associated with properties allegedly demolished at various times in February of 2009, see ¶¶2(1)-(4), (12)-(13), (15)-(29), (38)-(40) and ¶3(1).

For the claims associated with properties allegedly demolished at various times in March of 2009, see ¶¶ 2(31), (44), (46)-(47), (63).

For the claims associated with properties allegedly demolished at various times in April of 2009, see ¶¶ 2(37).

For the claims associated with properties allegedly demolished at various times in May of 2009, see ¶¶ 2(42), (55).

For the claims associated with properties allegedly demolished at various times in June of 2009, see ¶¶ 2(43), (45), (51).

For the claims associated with properties allegedly demolished at various times in July of 2009, see ¶¶ 2(69).

For the claims associated with properties allegedly demolished at various times in November of 2009, see ¶¶ 2(66)-(68).

For the claims associated with properties allegedly demolished but for which a time is unknown, see ¶¶ 2(50), (53)-(54), (56), (62).

For the claims associated with properties allegedly damaged but for which a time is unknown, see ¶ 3(2).

the plaintiffs in the underlying actions and for which SBPG seeks coverage do not constitute "occurrences" under the Lexington Policies, coverage is not triggered, and Lexington owes no obligation to SBPG. Even if it is assumed that the alleged demolition and/or property damage claimed by the plaintiffs in the underlying actions constitute occurrences under the Lexington Policies, which is expressly denied, because the damage to each individual property constitutes a separate "occurrence," Lexington's duties under the Lexington Policies, if any, are not triggered unless and until the $250,000 per occurrence retained limit is exhausted.[3]

## II. THE POLICIES.

Lexington issued Public Entities Excess Liability Policy No. 9607745, Public Entities Excess Liability Policy No. 001751696, and Public Entities Excess Liability Policy No. 026462477 to SBPG in effect from February 1, 2008 to February 1, 2009, February 1, 2009 to February 1, 2010, and February 1, 2010 to February 1, 2011 respectively (the "Lexington Policies"). The Insuring Agreements of the Lexington Policies provide:

> **We** shall pay that portion of the **ultimate net loss**, in excess of the **retained limit** or **underlying insurance**, whichever is greater, that the **insured**, becomes legally obligated to pay as **loss amounts** by reason of liability imposed by law or assumed under an **insured contract** because of **bodily injury, property damage**, or **personal and advertising injury** arising out of an **occurrence** during the Policy Period and to which this insurance applies.

The Lexington Policies define the relevant terms as follows:

**SECTION II. DEFINITIONS**

* * *

    **X.**    **Occurrence** means:

---

[3] Lexington has asserted other coverage defenses regarding the Underlying Lawsuits in its reservation of rights letters and expressly reserves those coverage defenses. However, the purpose of this declaratory judgment action is only to seek a declaration that (1) there has been no "occurrence" under the Lexington Policies, and (2) to the extent there has been an "occurrence," the damage suffered by each plaintiff identified in the Underlying Lawsuits constitutes a separate occurrence under the Lexington Policies such that until the retained limit for each occurrence is met, Lexington is not obligated under the Lexington Policies, if at all.

1. With respect to **bodily injury** or **property damage**, an accident, including continuous, repeated, or related exposure to substantially the same general harmful conditions, which results in **bodily injury** or **property damage** neither expected or intended from **your** standpoint. All such exposure to substantially the same general harmful conditions will be deemed to arise out of one **occurrence**.

    In the event of continuing or progressively deteriorating damage over any length of time, such damage shall be deemed to be one **occurrence**, and shall be deemed to occur only when such damage first commences.

2. With respect to **personal and advertising injury**, an offense arising out of **your insured organization** work that causes **personal and advertising injury.** All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

\* \* \*

S. **Loss amounts** means damages and shall also include all fees, including legal fees, costs and expenses, as well as those expenses described in subparagraph B.3.b. of SECTION I. COVERAGES that **we** incur in connection with the defense and settlement of **claims** or **suits we** defend. **Loss amounts** shall not include salaries of **our** employees.

\* \* \*

AA. **Personal and advertising injury** means injury, including consequential bodily injury arising out of one or more of the following offenses:

\* \* \*

3. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor.

EE. **Retained limit** means the **retained limit** applicable to each and every **occurrence, wrongful act, employment practices wrongful act,** or **employment benefit wrongful act** as shown in the Declarations and to which this insurance applies.

The **retained limit** shall be reduced by the payment of **loss amounts**, but shall not be reduced by the salaries of **your employees, your** office expenses, or expenses or any claims servicing organization that **you** have engaged.

\* \* \*

The Limits of Insurance provisions of the Lexington Policies provides, in relevant part, as follows:

    **SECTION III.**        **LIMITS OF INSURANCE**

\* \* \*

    **B.**        The Bodily Injury, Property Damage, and Personal and Advertising Injury Aggregate Limit as shown in the Declarations is the most **we** will pay for the sum of all **loss amounts** because of **bodily injury, property damage**, and/or **personal and advertising injury**, including **loss amounts** within the **products-completed operation hazard**, for which coverage is provided under subparagraph A.1. of the Insuring Agreements (SECTION I. COVERAGES), except for **loss amounts** because of **bodily injury** or **property damage** to which this insurance applies, caused by an **occurrence** and resulting from the ownership, maintenance or use of a covered **automobile**.

\* \* \*

    **L.**        The **retained limit** as shown in the Declarations:

        **1.**        Shall be reduced by **loss amounts** paid for **occurrences, wrongful acts, employment practices wrongful acts,** or **employee benefit wrongful acts** covered under this Policy; and

        **2.**        Applies separately to each and every **occurrence, wrongful act, employment practices wrongful act,** or **employee benefit wrongful act** or series of continuous, repeated, or related **occurrences, wrongful acts,** or **employee benefit wrongful acts;** and

        **3.**        Applies separately to each **municipality** insured under this Policy in the event that there are multiple **municipalities** as Named Insureds.

    **M.**        **Our** duty to pay any sums that **you** become legally obligated to pay arises only after there has been a complete expenditure of **your retained limit** or

>     all **underlying insurance,** whether collectible or not, has been exhausted by means of payments for judgments, settlements, or defense costs. **Your retained limit** shall not be exhausted by **your** office expenses, **employees'** salaries, or expenses of any **claims** servicing organization that **you** have engaged. **We** will then be liable only for that portion of damages in excess of **your retained limit** up to **our** limits of insurance.

The Lexington Policies are subject to a ten million ($10,000,000.00) per occurrence and aggregate limit of liability in excess of the $250,000 per occurrence retained limit.

## LAW AND ARGUMENT

### I. BECAUSE THERE HAS NOT BEEN AN "OCCURRENCE," COVERAGE IS NOT TRIGGERED UNDER THE LEXINGTON POLICIES

Because the alleged property damage was not caused by an "occurrence," as that term is defined by the Lexington Policies, coverage under the Lexington Policies is not triggered.

#### A. THERE WAS NO "OCCURRENCE" UNDER THE LEXINGTON POLICIES AS IT RELATES TO "PROPERTY DAMAGE."

For coverage to be triggered under the Lexington Policies, if at all, the alleged property damage must arise out of an "occurrence." As it relates to "property damage," the Lexington Policies define "occurrence," in relevant part, as "an accident, including continuous, repeated, or related exposure to substantially the same general harmful conditions, which results in bodily injury or property damage neither expected or intended from [the insured's] standpoint." Thus, as a preliminary matter, in order for coverage to even be triggered under the Lexington Policies for the claims asserted against SBPG in the Underlying Lawsuits, the alleged property damage must have been caused by "an accident…that results in property damage neither expected or intended" from the standpoint of the SBPG.

Louisiana law is well settled as to the interpretation of "occurrence" and the exclusion from the definition of "occurrence" damage that is "expected or intended" from the standpoint of the insured, commonly referred to as the intentional injury provision. "The purpose of the

7

intentional injury provision is to prevent an insured from acting wrongfully with the security of knowing that his insurance company will pay the piper for the damages." *Williams v. City of Baton Rouge*, 98-1981, p. 19 (La. 4/13/99) 731 So.2d 240, 253; *Great Am. Ins. Co. v. Gaspard*, 608 So.2d 981, 984 (La. 1992); *Yount v. Maisano*, 627 So.2d 148, 151 (La. 1993); *Breland v. Schilling*, 550 So.2d 609, 610 (La. 1989). "Not all injuries resulting from an intentional act will be excluded, but only those injuries that were themselves intended." *Williams*, supra; *Gaspard*, supra, 608 So.2d at 985; *Yount*, supra, 627 So.2d at 152. "The subjective intent of the insured, as well as his reasonable expectations as to the scope of his insurance coverage, will determine whether an act is intentional." *Gaspard*, supra; *Yount*, supra; *Breland*, supra. "An act is intended if the perpetrator desires the results of his action or he believes that the results are substantially certain to occur." *Williams*, supra; *Gaspard*, supra; *Yount*, supra; *Breland*, supra, 550 So.2d at 613. As for the reasonable expectation of the insured regarding the scope of his coverage, the Louisiana Supreme Court has held that:

> [W]hen minor bodily injury is intended, and such results, the injury is barred from coverage. When serious bodily injury is intended, and such results, the injury is also barred from coverage. When a severe injury of a given sort is intended, and a severe injury of any sort occurs, then coverage is also barred. But when minor injury is intended, and a substantially greater or more severe injury results, whether by chance, coincidence, accident, or whatever, coverage for the more severe injury is not barred.

*Breland,* supra, 550 So.2d at 614; *Williams,* supra; *Yount*, supra. As this language indicates, it is only those fortuitous or unexpected injuries or damage resulting from an intentional act that will remain covered under an occurrence policy; the injuries or damage that is expected or intended, however, will not be covered.

Applying these principles to the facts of this case, it is clear that SBPG's acts involving complete demolition and damage to properties do not constitute an "occurrence" under the

8

Lexington Policies as the damage to these properties was expected and intended from the standpoint of SBPG. In its answer, SBPG admits that in February of 2008, it condemned a number of structures within the parish that it deemed as failing to meet the minimum housing standards mandated by the St. Bernard Parish Code of Ordinances. *See* St. Bernard Parish Government's Answer, Doc. 9 at ¶ VIII. In addition, SBPG admits that it "condemned houses that posed a threat to the health, safety and/or safety to the residents of St. Bernard parish so that houses could be demolished." *See* Id. at ¶ IX. Furthermore, SBPG admits that the fifty-seven properties identified in the *Estopinal* Litigation were demolished or damaged over the course of the 2008 and 2009 calendar years. *See* Id. at ¶ 14. Additionally, in its Opposition to Lexington's Motion for Summary Judgment that is currently pending before the Court, it did not dispute Lexington's argument that the "property damage" alleged in the Underlying Lawsuits was expected or intended from the standpoint of SBPG.

By its own admission, SBPG intended to demolish or damage the properties identified in the underlying actions and for which it seeks coverage. SBPG admits that it condemned the properties for the purpose, or in other words, with the intent that they would be demolished. As the SBPG intended to cause the property damage alleged in the underlying actions and for which it seeks coverage, the damage was "expected or intended" from the standpoint of the insured, and thus, do not constitute "occurrences" under the Lexington Policies.

Because SBPG's acts involving complete demolition and damage to properties cannot constitute an "accident" or be characterized as property damage "neither expected or intended" from the standpoint of SBPG, there has been no occurrence, and the Lexington Policies are not triggered.

**B.  THERE WAS NO "OCCURRENCE" UNDER THE LEXINGTON POLICIES AS IT RELATES TO "PERSONAL AND ADVERTISING INJURY."**

The definition of "occurrence" provided by the Lexington Policies has two subparts, one defining an "occurrence" as it relates to "property damage," as discussed above, and one defining an "occurrence" as it relates to "personal and advertising injury." Specifically, the Lexington Policies define "occurrence" as it relates to "personal and advertising injury," in relevant part, as follows:

> an offense arising out of **your insured organization** work that causes **personal and advertising injury.** All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one **occurrence**, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.

The Lexington Policies provide that "personal and advertising injury" means injury, including consequential bodily injury, arising out of one or more of the following offenses:

> 3.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor.

In other words, this offense has two elements: (1) wrongful eviction, entry or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, (2) by or on behalf of its owner, landlord or lessor. In *Kite v. Gus Kaplan, Inc.*, for example, the Louisiana Supreme Court found coverage was triggered under an occurrence-based policy for "personal and advertising injury" where the <u>lessor</u> relocated the lessee's merchandise and retail space without the consent of the lessee, constituting a "wrongful eviction" <u>by the lessor</u> of the property. 98-0751, p. 17-19 (La. 11/17/99) 747 So.2d 503, 513-514. *See also Short v. Birdwell*, (E.D. La. 1992)(finding coverage under "personal and advertising injury" was triggered where the *owners*

of apartments refused to provide information regarding rental of the apartment to plaintiffs on the basis of race discrimination).

It is undisputed that SBPG was not the owner, landlord or lessor of the properties at issue in the Underlying Lawsuits. Thus, because the facts are undisputed that SBPG was not the owner, landlord or lessor of the properties at issue in the Underlying Lawsuits, coverage is not triggered as it relates to "personal and advertising injury."

## II. INDIVIDUAL CLAIMS FOR PROPERTY DAMAGE CONSTITUTE SEPARATE "OCCURRENCES" UNDER THE LEXINGTON POLICIES.

Even if it is assumed that the property damage alleged in the underlying actions arose out of an "occurrence" under the Lexington Policies, which is expressly denied, under Louisiana law and the unambiguous terms and conditions of the Lexington Policies, the claim of each individual plaintiff for the alleged demolition and/or damage to his property constitutes a separate "occurrence" under the Lexington Policies.

The Louisiana Supreme Court's decision in *Lombard v. Sewerage and Water Board of New Orleans* is the seminal case addressing the issue of determining the number of "occurrences" under an "occurrence"-based policy. 284 So.2d 905 (La. 1973). The case involved seventeen consolidated suits involving one hundred and nineteen plaintiffs who brought suit for residential damage caused by a construction and installation project, commencing December 4, 1962 and concluding in March of 1964, in the city of New Orleans. *Id.* at 907. Travelers Insurance Company ("Travelers") issued a liability policy to the City of New Orleans and the Sewerage and Water Board, which afforded $50,000 in coverage per occurrence and $100,000 aggregate coverage for operations conducted by independent contractors. *Id.* at 915. The Travelers Policy defined "occurrence" as:

> Either an accident or a continuous or repeated exposure to conditions which results during the policy period in injury to person or real or tangible property which is accidentally caused. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence.

*Id.* Travelers argued that the work carried on by the Sewerage and Water Board constituted a single occurrence as the alleged property damage occurred as a result of exposure to substantially the same general conditions – the construction project itself. *Id.* The Louisiana Supreme Court disagreed. *Id.* at 916. In finding that the damage to each piece of property constituted a separate occurrence, the Louisiana Supreme Court stated:

> As a rational matter, however, it can hardly be said that this construction project lasting more than one year is a single "occurrence" within the contemplation of the quoted clause. Rather, we think it is more logical to view this project as a series of "occurrences" resulting in damage during the course of this prolonged undertaking. **The word "occurrence" as used in the policy must be construed from the point of view of the many persons whose property was damaged.** As to each of these plaintiffs, the cumulated activities causing damage should be considered as one occurrence, though the circumstances causing damage consist of a continuous or repeated exposure to conditions resulting in damage arising out of such exposure. **Thus, when the separate property of each plaintiff was damaged by a series of events, one occurrence was involved insofar as each property owner was concerned. Notwithstanding, therefore, that the same causes may have operated upon several properties at the same time resulting in varying degrees of damage, it cannot be regarded as one occurrence,** *but the damage to each plaintiff is a separate occurrence*.

*Id.* at 915-916 (emphasis added); *See also Tesvich v. 3-A's Towing Co.,* 547 So.2d 1106, 1111 (La. App. 5th Cir. 1989)(finding that that damage to a number of oyster leases constituted a separate occurrence as to each injured leaseholder).

This Court adopted the reasoning of *Lombard* in *Reynolds v. Transcontinental Insurance Company*, 1995 WL 16795 (E.D. La. 1995)(which found there was a separate "occurrence" to each of the five individuals who suffered injury and/or death when they were exposed to varying levels of carbon monoxide occurring over at least a 24 hour period). The United States Fifth

Circuit Court of Appeals has also followed this same approach. *See Society of Roman Catholic Church of Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Cas. Co.*, 26 F.3d 1359 (5th Cir. 1994); *Exxon Corp. v. St. Paul Fire and Marine Ins. Co.*, 139 F.3d 781 (5th Cir. 1997).

In *Society of Roman Catholic Church of Diocese of Lafayette and Lake Charles, Inc. v. Interstate Fire & Casualty Company*, the United States Fifth Circuit Court of Appeal was called upon to determine whether the abusive acts of two priests as to thirty-one children over a period of seven years constituted one global occurrence or separate occurrences for each child. 26 F.3d 1359, 1361 (5th Cir. 1994). Much like the facts in this case, the Diocese had a form of self-insurance for the first layer of coverage by contributing $400,000 to a yearly loss fund from which the Diocese was responsible for the first $100,000 of each occurrence. *Id*. at 1362. Lloyd's of London, like Lexington, offered excess aggregate coverage of $450,000 above the $100,000 for which the Diocese was responsible. *Id*. All of the insurance policies were "occurrence" based policies. *Id*. In connection therewith, the district court held that "occurrence" should be defined on a per child basis and that as thirty-one children were molested, there were thirty-one separate occurrences. *Id*. Looking to *Lombard* for guidance, the United States Fifth Circuit Court of Appeal affirmed the district court's ruling, finding that "the damage to each child is a separate occurrence." *Id*. at 915-916.

A similar result was reached by the Fifth Circuit Court of Appeals in *Exxon Corp. v. St. Paul Fire and Marine Insurance Company*. 129 F.3d 781, 788 (5th Cir. 1997). In the case, five individuals brought claims for bodily injury against Exxon after allegedly being exposed to hazardous material. *Id*. at 783. Specifically, Exxon closed a surface impoundment at its gas treating facility, and in order to dispose of the sludge that had accumulated at the facility, Exxon

contracted with Land Treatment Systems, Inc. ("LTS") to receive the sludge at its waste facility. *Id*. Exxon, in turn, contracted with McDonough Marine Service to transport the sludge from its facility to LTS's facility. *Id*. According to the district court's opinion, a captain and deckhand were aboard the transportation vessel when it departed from Exxon's facility on April 27, 1989. *See Exxon Corp. v. St. Paul Fire and Marine Co.*, 1996 WL 665751 at * 1 (E.D. La. 1996). While the captain was at the wheel, he began to suffer from burning eyes, stomach cramps, and headaches. *Id*. The deckhand eventually took over the wheel, at which time he began to feel ill, experiencing chest pains, difficulty breathing, and headaches. *Id*. Four employees participated in the unloading operations upon the vessel's arrival at the LTS facility on the night of April 29, 1989. *Id*. at *2. Each of these four employees also claimed to have suffered bodily injury from exposure to the sludge, including dizziness, sour stomach, tightness in the chest, difficulty breathing, weakness, dizziness, and nausea. *Id*. All five of the individuals brought suit against Exxon for the claimed bodily injury. *Id*.

While before the United States District Court for the Eastern District Court of Louisiana, cross motions for summary judgment were filed by St. Paul Fire and Marine Insurance Company, the insurer, and Exxon, seeking a determination of the number of "occurrences" within the meaning of the policy. *Id*. at *1. Relying on *Lombard*, the district court found that there were five separate "occurrences" under the policy. *Id*. at *3. In so finding, the district court's opinion provides:

> The five individuals in the instant case did not experience the consequences of a single, identifiable event. Orgeron [the captain] and Rainone [the deckhand] were exposed over a three day period to varying levels of exposure to the alleged hazardous conditions. The exposure changed with each person's duties over the voyage and location on the ship. Likewise, Darbonne, Gauthreaux and Burse [the LTS unloading employees] had separate duties and interacted with the sludge in varying degrees in different ways.

14

In finding that the damage to each individual constituted a separate occurrence, the district court stated "*Lombard* and its progeny are not new cases. An insurance company delivering a policy in Louisiana must be aware of this jurisprudence." *Id*. at *5.

On appeal, the United States Fifth Circuit Court of Appeal affirmed the district court's ruling. *Exxon Corp. v. St. Paul Fire and Marine Ins. Co.*, supra, 129 F.3d at 788. In its reasoning, the Fifth Circuit stated:

> St. Paul's third and final argument asks us to decide whether the district court erred in determining that the personal injuries underlying this action constituted five (5) occurrences or accidents within the insurance policy. St. Paul contends that the district court erred in affording Exxon "special interpretation of this policy favoring coverage." St. Paul suggests that the number of occurrences should be determined by the causes rather than the injury. Under this reasoning, St. Paul would have the court determine that there was one (1) occurrence rather than five (5). St. Paul argues that the district court's holding is in error particularly because of Exxon's size and concurrent "deep pockets," which would allow it to provide for uncovered claims. The district court was not persuaded by this argument and noted that in the case of *Lombard v. Sewerage and Water Board of New Orleans*, the Louisiana Supreme Court interpreted the term occurrence in just such a repeated exposure situation. That court determined that "when the separate property of each plaintiff was damaged by a series of events, one occurrence was involved insofar as each property owner was concerned." Comparing the facts in *Reynolds v. Transcontinental Insurance Company* to those in the instant case, Exxon argues that because the alleged injuries were discrete and occurred over a period of time, they should properly be considered separate occurrences. Further, Exxon argues, because the St. Paul policy contains no definition of occurrence, the ambiguity of the contract should be resolved in favor of the insured. We find this argument persuasive and conclude that the district court did not err in its interpretation of the policy.

*Id*. (internal citations omitted).

Thus, under both the plain language of the Lexington Policies and applicable Louisiana and Fifth Circuit law, the damage to each individual and separate property identified in the Underlying Lawsuits constitutes a separate occurrence under the Lexington Policies.

15

### III. LEXINGTON'S DUTIES UNDER THE POLICIES, IF ANY, ARE NOT TRIGGERED UNTIL THE PER OCCURRENCE RETAINED LIMIT HAS BEEN EXHAUSTED FOR EACH SEPARATE OCCURRENCE.

The Lexington Policies are excess policies and specifically provide coverage for "that portion of the ultimate net loss, in excess of the retained limit or underlying insurance, whichever is greater, that the insured becomes legally obligated to pay as loss amounts by reason of liability imposed by law or assumed under an insured contract because of bodily injury, property damage, or personal and advertising injury arising out of an occurrence during the Policy Period to which this insurance applies." In addition, the Lexington Policies provide that the duty to pay any sums the SBPG becomes legally obligated to pay "arises only after there has been a *complete* expenditure of your retained limit or all underlying insurance, whether collectible or not, has been exhausted." The Lexington Policies further provide that the retained limit as shown in the Declarations "applies separately to each and every occurrence." Thus, because the damage to each individual property identified in the Underlying Lawsuits constitutes a separate occurrence, the Retained Limit of $250,000 applies separately to each.

### CONCLUSION

For the foregoing reasons, Lexington submits that coverage has not been triggered under the Lexington Policies. Under the undisputed facts of this case, there has been no "occurrence" under the Lexington Policies, and as such, coverage is not triggered under the Lexington Policies. Even if it is assumed that the demolition and/or damage to a piece of property resulting from SBPG's acts of intentional condemnation constitutes an "occurrence" under the Lexington Policies, which is expressly denied, the damage to each individual property identified in the Underlying Lawsuits constitutes a separate "occurrence" under the Lexington Policies under the well-settled law of the Louisiana Supreme Court. As such, the $250,000 per occurrence retained

limit, as defined by the Lexington Policies, applies separately to each subject property and must be exhausted before Lexington's duties, if any, are triggered under the Lexington Policies.

Respectfully submitted,

/s/ Robert I. Siegel_____
ROBERT I. SIEGEL (#12063)
E-Mail: RSIEGEL@GLLLAW.COM
ALISTAIR M. WARD (#24693)
Gieger, Laborde & Laperouse, LLC
E-Mail: AWARD@GLLLAW.COM
One Shell Square – Suite 4800
701 Poydras Street
New Orleans, Louisiana 70139-4800
Telephone: (504) 561-0400
Facsimile: (504) 561-1011
*Counsel for Lexington Insurance Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing pleading has been electronically filed this date and delivered to all counsel of record by Notice of Electronic Filing from the Court, by depositing a copy of same in the United States mail, first class postage prepaid and properly addressed, by hand delivery, via facsimile transmission or via electronic mail from the undersigned counsel, this 4th day of June, 2012.

/s/ Robert I. Siegel_____