UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LEXINGTON INSURANCE COMPANY                    CIVIL ACTION

VERSUS                                         NO: 11-1865

ST. BERNARD PARISH GOVERNMENT                  SECTION: R

**ORDER AND REASONS**

**I.    INTRODUCTION**

This insurance dispute arises out of the St. Bernard Parish
Government's condemnation and demolition of numerous structures
in the Parish. After Hurricane Katrina, St. Bernard passed an
ordinance that required Parish residents to repair their
properties before specific deadlines and authorized St. Bernard
to remove unsafe buildings if residents did not comply with the
deadlines.  St. Bernard identified thousands of structures that
were not in compliance with the ordinance. In January 2008, the
St. Bernard Parish Council approved condemnation of a list of
5,731 structures, after which many of the identified structures
were demolished over the course of more than a year.

On February 26, 2009, seventy-three property owners sued St.
Bernard in Louisiana state court, asserting claims of inverse
condemnation.  The plaintiffs in the state court lawsuit,
*Estopinal v. Parish of St. Bernard*, allege that St. Bernard and
other defendants improperly demolished or damaged structures on
their properties without proper notice, hearing or due process,

constituting a taking of each plaintiff's property in violation of the Louisiana Constitution, Article 1, Section 14(B). Plaintiffs assert that their damages are the result of the defendants' intentional, negligent, reckless or careless actions. Lexington Insurance Company issued St. Bernard three excess public entity liability insurance policies that covered the time period in question. St. Bernard seeks coverage under these policies for the claims asserted in the *Estopinal* lawsuit and subsequent state court suits filed on similar grounds.

On August 3, 2011, Lexington filed a complaint in this Court, seeking a declaratory judgment that the damage to each individual property constituted a separate occurrence under the insurance policies and therefore the damage to each property must exceed the $250,000 retained limit before Lexington's duty to provide coverage to St. Bernard is triggered under the policies.[1] During the parties' pre-trial conference, the parties agreed to submit stipulated facts and proposed findings of fact and conclusions of law to the Court for judgment.[2]  Lexington's complaint did not raise the question of whether an "occurrence" even took place under the terms of the insurance policies. But, the Court found that the inclusion of the issue in the proposed pretrial order submitted jointly by the parties demonstrated that

---

[1]     R. Doc. 1.

[2]     R. Doc. 32.

sufficient notice existed and that the Court therefore should rule on the issue, particularly since the question of whether there were separate occurrences depends on an initial finding that an occurrence took place.[3]  The Court instructed the parties to address the issue in their findings of fact and questions of law.

The dispute thus turns on two questions: 1) whether an "occurrence" took place under the terms of the insurance policy that would trigger Lexington's duty to provide coverage to St. Bernard, and 2) if so, whether the damage to each plaintiff's property was a separate occurrence such that the damage to each property must exceed the policy threshold of $250,000 or whether a single retained limit should apply to all of the property damage produced by St. Bernard's actions as a series of related occurrences.

After considering the entirety of the written record submitted by the parties, the Court finds that a series of related occurrences took place under the terms of the insurance policies and that Lexington therefore owes St. Bernard coverage for the injuries experienced by the plaintiffs in the state court suits.  These determinations are based on the following findings of fact and conclusions of law. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such. To

---

[3]     *See* R. Doc. 28.

the extent a conclusion of law constitutes a finding of fact, the Court adopts it as such.

## II.  FINDINGS OF FACT

In the wake of Hurricane Katrina, St. Bernard passed an ordinance on July 6, 2006 that addressed structures destroyed or damaged beyond habitability. The ordinance required Parish residents to clean and secure the structures on their properties and complete exterior repairs before specific deadlines in order to ensure that homes met minimum housing standards and did not threaten public safety.[4]  The ordinance provided that St. Bernard could clean or secure properties if owners did not comply with the ordinance.[5] It also gave St. Bernard the authority to determine whether structures required removal or demolition and to carry out any necessary actions.[6]  Over the next several years, agents of St. Bernard entered and inspected thousands of properties. On January 22, 2008, the St. Bernard Parish Council adopted a motion, condemning 5,731 structures that did not meet the minimum housing codes set forth in the 2006 ordinance or that threatened the health or safety of Parish residents.[7] St. Bernard

---

[4]    R. Doc. 33 at 1-2 (Joint Stipulations).

[5]    Def. Exh. 5. at 3-6.

[6]    Def. Exh. 5 at 3-6; R. Doc. 35-2.

[7]    Def. Exh. 5-Z.

then began demolition procedures, which took place over the course of more than a year.[8]

St. Bernard faces claims of inverse condemnation, stemming from the *Estopinal* lawsuit filed in state court in 2009 that identifies seventy-three named plaintiffs and fifty-seven impacted properties.[9] All of the plaintiffs claim that their properties were demolished or damaged by St. Bernard pursuant to its ordinances, except for Gerald Artique, who alleges that he "was harassed in the anticipated demolition of his property."[10] The condemnation and demolition actions occurred at different times over the course of more than a year.[11] St. Bernard does not own the properties at issue, and it did not act as landlord or lessor for any of the properties.[12]

Lexington issued St. Bernard three excess public entity liability insurance policies providing coverage from February 1,

---

[8]    R. Doc. 33 at 6.

[9]    *Id.* at 5-6. Other suits that seek similar relief have been filed against St. Bernard. *Id.* at 5.

[10]    *Id.* at 6.

[11]    R. Doc. 33 at 6.

[12]    *Id.*

2008 to February 1, 2011.[13] The relevant provisions of the three policies contain identical language.[14]  Under the policies:

> **[Lexington]** shall provide that portion of the **ultimate net loss**, in excess of the **retained limit** or underlying insurance, whichever is greater, that the **insured** becomes legally obligated to pay as **loss amounts** by reason of liability imposed by law or assumed under an insured contract because of **bodily injury, property damage, or personal and advertising injury** arising out of an **occurrence** during the Policy Period and to which this insurance applies.[15] (original emphasis)

Under the policies, there is a $250,000 retained limit.[16] The retained limit is "[a]ny one occurrence or wrongful act or employment practices wrongful act or employment benefit wrongful act or series of continuous, repeated, or related occurrences or wrongful acts or employment practices wrongful acts or employment benefit wrongful acts."[17] The policies further state that "[t]he retained limit as shown in the Declarations . . . applies separately to each and every occurrence, wrongful act, employment practices wrongful act, or employee benefit wrongful act or

---

[13]      *Id.*; Exhs. 1-3. Policy Number 9607745 provided coverage from February 1, 2008 to February 1, 2009.  Policy Number 001751696 provided coverage from February 1, 2009 to February 1, 2010.  Policy Number 026462477 provided coverage from February 1, 2010 to February 1, 2011.

[14]      R. Doc. 33 at 2-5; Exhs. 1-3.

[15]      R. Doc. 33 at 2.

[16]      *Id.* at 5.

[17]      R. Doc. 33 at 5.

series of continuous, repeated, or related occurrences, wrongful

acts, or employee benefit wrongful acts."[18]

    The policies define an "occurrence" as:

> With respect to **bodily injury** or **property damage**, an
> accident, including continuous, repeated, or related
> exposure to substantially the same general harmful
> conditions, which results in **bodily injury** or **property
> damage** neither expected or intended from your
> standpoint. . . .
>
> With respect to **personal and advertising injury**, an
> offense arising out of **your insured organization** work
> that causes **personal and advertising injury**. All
> damages that arise from the same related, or repeated
> injurious material or act will be deemed to arise out
> of one **occurrence**, regardless of the frequency or
> repetition thereof, the number and kind of media used
> and the number of claimants.[19] (original emphasis).

The policies further define "personal and advertising injury" as

injury arising out of, *inter alia*, "[t]he wrongful eviction from,

wrongful entry into, or invasion of the right of private

occupancy of a room, dwelling or premises that a person occupies

by or on behalf of its owner, landlord or lessor".[20]


**III. CONCLUSIONS OF LAW**

    Louisiana substantive law governs this insurance policy

dispute, as the case is before the Court under diversity

---

[18]    *Id.* at 4.

[19]    *Id.* at 3.

[20]    R. Doc. 33 at 2.

jurisdiction. *See* 28 U.S.C. § 1332; *Jesco Const. Corp. v. NationsBank Corp.*, 278 F.3d 444, 447 (5th Cir. 2001) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). Under Louisiana law, in an action under an insurance contract, the insured bears the burden to prove the existence of the policy and coverage. The insurer bears the burden to establish policy limits or exclusions. *Tunstall v. Stierwald*, 809 So.2d 916 (La. 2002). An insurance policy should be construed using the general rules of contract interpretation set forth in the Louisiana Civil Code. *Bonin v. Westport Ins. Corp.*, 930 So.2d 906, 910 (La. 2006) (citing *Cadwallader v. Allstate Ins. Co.*, 848 So.2d 577, 580 (La. 2003)). This means that "[w]ords and phrases used in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning." *Id.* (citing La. Civ. Code art. 2047). Further, "[a]mbiguous policy provisions are generally construed against the insurer and in favor of coverage." *Cadwallader*, 848 So.2d at 580 (citing La. Civ. Code art. 2056). The contract, however, "should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or to restrict its provisions beyond what is reasonably contemplated by unambiguous terms or [to] achieve an absurd conclusion." *Id.* Therefore, if the wording is clear, "the insurance contract must be enforced as written." *Id.*

8

1. *Meaning of "Occurrence"*

The Lexington insurance policies provide coverage for two types of occurrences: (1) bodily injury or property damage and (2) personal and advertising injury.[21] The Court first finds that no occurrence took place with respect to bodily injury or property damage. St. Bernard does not assert in its proposed conclusions of law that this type of occurrence took place and focuses instead on whether the property destruction caused personal and advertising injury.[22] Indeed, for an act to constitute an occurrence involving bodily injury or property damage under the terms of the insurance agreements, there must be an accident that results in bodily injury or property damage that is "neither expected or intended from your standpoint."[23] The insurance policies state that the word "your" refers to the named insured, in this case, St. Bernard.[24] Under Louisiana law, "an act is intended if the perpetrator desires the results of his action or he believes that the results are substantially certain to occur." *Yount v. Maisano*, 627 So. 2d 148, 152 (La. 1993). "[N]ot all injuries resulting from an intentional act will be

---

[21]   R. Doc. 33 at 2-2.

[22]   R. Doc. 35-1 at 5.

[23]   R. Doc. 33 at 3.

[24]   Exhs. 1 at 1; 2 at 1; 3 at 1.

9

excluded, but only those injuries that were themselves intended."
*Id.*

St. Bernard deliberately enacted provisions to address
unsafe structures following Hurricane Katrina, as evidenced by
its 2006 ordinance and 2008 condemnation of structures that
failed to meet the standards set forth in the ordinance or that
threatened the health or safety of Parish residents.[25] There are
no allegations in the state court suits of bodily injury as that
term is defined in the insurance policies,[26] and the property
damage at issue resulted from the demolition of structures by St.
Bernard. The Court finds that this damage does not exceed the
consequences that St. Bernard foresaw when it set out to condemn
and dismantle properties it deemed a threat to public health.
Because the property damage suffered by the state court
plaintiffs was both expected and intended by St. Bernard, the
damage therefore did not constitute an occurrence under the
bodily harm or property damage provision of the insurance
contracts.

---

[25]    R. Doc. 33; Def. Ex. 5, 6.

[26]    To the extent that plaintiffs allege mental injuries or
emotional distress resulting from St. Bernard's actions, such
injuries fall under the policies' definition of bodily injury
only if they "result[] directly from bodily injury." Exhs. 1 at
3; 2 at 3; 3 at 3. Bodily injury is defined as "bodily harm,
sickness, disability or disease sustained by a person, including
death resulting from any of these at any time." *Id.*

Whether an occurrence took place that would trigger Lexington's coverage of damages owed by St. Bernard rests on the existence, *vel non*, of personal and advertising injuries to the state court plaintiffs.[27] As described above, under the terms of the insurance policies, a personal and advertising injury occurs when there is "a wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies **by or on behalf of its owner, landlord or lessor**."[28] (emphasis added). Plaintiffs in the state suits are property owners who assert inverse condemnation claims, except for one plaintiff who alleges that St. Bernard interfered with his right of private occupancy.[29] For the reasons that follow, the Court determines that the personal and advertising provision is ambiguous, and it construes the provision against Lexington and in favor of coverage.

---

[27]   Lexington posits that St. Bernard attempts to declare its actions "wrongful acts" rather than occurrences to assert error and omissions coverage. Exhs. 1 at 1; 2 at 1; 3 at 1. (Policy Declarations). Lexington is correct that the policies do not provide error and omissions coverage. *Id*. The Court finds, however, that St. Bernard uses the term "wrongful act" to describe its actions under the personal and advertising injury provision of the policies, not to invoke error and omissions coverage.

[28]   R. Doc. 33. at 2. Under the terms of the policies, other offenses also qualify as personal and advertising injuries, but none has been raised in this suit.

[29]   *Id.* at 6.

The definition of a personal and advertising injury includes as an element the phrase "by or on behalf of its owner, landlord or lessor."[30] St. Bernard and Lexington present conflicting interpretations of this language. St. Bernard argues that this phrase modifies the words "that a person occupies," and therefore, a personal and advertising injury occurs either when property owners are evicted wrongfully or when individuals who occupy a dwelling on behalf of an owner, landlord, or lessor are evicted wrongfully.[31] Lexington contends that the phrase "by or on behalf of its owner, landlord or lessor" modifies the wrongful acts themselves so that the owner, landlord, or lessor of the premises, or someone acting on his behalf, must be the actor who undertakes the wrongful eviction, entry, or invasion.

The Louisiana Supreme Court has not expressly addressed whether the language at issue describes the person or entity responsible for the wrongful act or establishes the right of occupancy necessary to trigger coverage.  *See, e.g., Kite v. Gus Kaplan Inc.*, 747 So.2d 503 (La. 1999) (applying provision in case involving allegedly wrongful eviction of tenant by his landlord without discussion of provision's scope). Most of the federal appellate courts considering the issue have found the provision "by or on behalf of its owner" either ambiguous or as modifying

---

[30]    R. Doc. 33 at 2.

[31]    R. Docs. 35-1 at 8-9; 41.

12

the phrase "that a person occupies." For example, the Fifth
Circuit Court of Appeals interpreted the phrase "by or on behalf
of its owner, landlord or lessor" in an identical insurance
provision under Mississippi law. *American Guarantee and Liab.
Ins. Co. v. The 1906 Co.,* 273 F.3d 605, 621 (5th Cir. 2001). The
court held that the language could be reasonably interpreted to
apply when the victim of the wrongful action occupied the
premises through the agency of or in the interest of the owner.
*Id.* Specifically, the court held that insurance coverage applied
because models who were secretly videotaped while changing in a
dressing room had a private right of occupancy of the dressing
room. *Id.* Significantly, the trial court and an earlier Fifth
Circuit panel had held that the property owner was not
vicariously liable for the actions of the voyeur. *Id.* at 607-08.
Thus, the bad actor was legally determined *not* to be the owner of
the property, and the victims were nevertheless entitled to
recover because they occupied the rooms by the authority of the
owner.  The court determined that the Mississippi Supreme Court
would likely interpret the insurance provision in favor of
coverage or find it to be ambiguous. *Id*. at 621. In so holding,
the court examined the definitions of the words "by" and "on
behalf of" and concluded that the ordinary meaning of the words
suggested that a reasonable interpretation of the provision was
that the victim must occupy a room "through, through the medium

13

of, through the agency or instrumentality of, by the authority of, according to, in relation to, or in the interest of the owner of the room." *Id.* at 620-21 (internal quotations omitted).

Similarly, the Third Circuit held that the linguistic structure of the same provision was ambiguous. *New Castle County, Del. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 174 F.3d 338, 348-350 (3d Cir. 1999). In a detailed textual analysis, the court noted that the provision, as a qualifying or modifying phrase, should be construed to refer to its nearest antecedent, the phrase "that a person occupies." *Id.* at 348. The court concluded that a reasonable interpretation of the policy allowed for coverage of a wrongful act committed by a person who did not own the property in question or act on the owner's behalf. *Id.* at 349-350; *see also Royal Ins. Co. Of America v. Kirksville College of Osteopathic Medicine*, 191 F.3d 959 (8th Cir. 1999)(same); *U.S. v. Security Management Co., Inc.*, 96 F.3d 260, 265 (7th Cir. 1996) (commenting in dicta that language could exclude from coverage unapproved sub-lessees); *but see Chimera Investment Company v. State Farm Fire & Cas. Co.,* 268 Fed. Appx. 793, 797 (10th Cir. 2008) (insurance policy inapplicable because its "coverage extends to wrongful entry or eviction [and so forth]'by or on behalf of its owner,'" and wrongful entry was done in defiance of owner rather than on its behalf).

14

Based on the foregoing authorities and the structure of the provision at issue, the Court concludes that the Louisiana Supreme Court would likely hold the provision to be ambiguous and interpret it in favor of coverage. *See Cadwallader*, 848 So.2d at 580 ("Ambiguous policy provisions are generally construed against the insurer and in favor of coverage."). Under Louisiana law, a contract is ambiguous "when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction." *Am. Druggists Ins. Co. v. Henry Contracting, Inc.*, 505 So.2d 734, 737 (La. Ct. App. 1987). Although the provision is inartfully worded, the placement of the phrase "by or on behalf of its owner, landlord or lessor" closer to the words "premises that a person occupies" than to the listing of the wrongful acts suggests that it establishes the right of occupancy necessary for coverage to apply. That the phrase can also be reasonably interpreted as Lexington suggests to identify the wrongful actor simply renders it ambiguous. Further, Lexington drafted the policy language and could have chosen to make the provision clearer. In fact, many insurance policies contain provisions that are nearly identical to the one at issue but include the word "committed" to establish that the phrase "by or on behalf of" modifies the actor. *See, e.g., George S. May Int'l Co. v. Arrowpoint Capital Corp.*, 97 So. 3d 1167, 1173 (La.

Ct. App. 2012) (personal and advertising injury defined as "the wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, *committed* by or on behalf of its owner, landlord or lessor") (emphasis added).

As the Court finds the insurance provision to be ambiguous, it construes it as providing coverage to St. Bernard. Lexington does not dispute that the actions taken by St. Bernard in condemning and demolishing structures can be characterized as "wrongful eviction[s]," "wrongful entr[ies]," or "invasion[s] of the right of private occupancy" under the terms of the policies. Nor is there any indication in the record that the individuals affected were not legal residents occupying the properties on behalf of the property owners. Thus, the Court determines that the injuries caused by St. Bernard in condemning or demolishing properties qualify as personal and advertising injuries, even though St. Bernard owned none of the properties and did not act as landlord or lessee.[32] The Court accordingly finds that an occurrence involving personal and advertising injuries took place under the terms of the insurance policies, which triggered Lexington's duty to provide coverage to St. Bernard.

---

[32]   R. Doc. 33 at 6.

B.   *Number of Occurrences*

Lexington contends that even if St. Bernard's actions and the resulting effects fall within the definition of an occurrence, Lexington has no duty to provide coverage, as the retained limit set by the policies has not been met. The Lexington policies have a retained limit of $250,000, and Lexington's duty to pay "arises only after there has been a complete expenditure of [St. Bernard's] retained limit."[33] The declaration pages of the policies state that this retained limit applies to "[a]ny one occurrence . . . or series of continuous, repeated, or related occurrences."[34] The policies further reiterate that the retained limit "[a]pplies *separately* to each and every occurrence. . . or series of continuous, repeated, or related occurrences."[35] The parties do not dispute that the value of each property demolished or damaged by St. Bernard is less than $250,000.[36]

Lexington argues that the Louisiana Supreme Court's holding in *Lombard v. Sewerage and Water Board of New Orleans* requires a finding that each instance of property damage or demolition by St. Bernard constitutes a separate occurrence for which the

---

[33]   Exhs. 1 at 10; 2 at 10; 3 at 10.

[34]   Exhs. 1 at 1; 2 at 1; 3 at 1.

[35]   Exhs. 1 at 10; 2 at 10; 3 at 10.

[36]   R. Doc. 33 at 6.

retained limit must be exhausted before Lexington has a duty to provide coverage. 284 So.2d 905 (La. 1973). In *Lombard*, hundreds of plaintiffs sued the city, its sewerage and water board, and a construction company and its insurers for property damage caused by construction and installation of an underground canal that lasted for over a year. *Id.* at 907. The court interpreted the bodily injury and property damage liability provisions of the policy, which defined "occurrence" as "either an accident or a continuous or repeated exposure to conditions which results during the policy period in injury to person or real or tangible property which is accidentally caused." *Id.* at 915. The policy also stated that "[a]ll damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence." *Id.* The policy afforded coverage of $50,000 per occurrence, so that if all of the plaintiffs' claims arose from a single occurrence, the insurer paid only $50,000. *Id.*

In addressing the proper method for determining whether the damages should be considered a single occurrence or separate occurrences, the court stated:

> [W]hen the separate property of each plaintiff was damaged by a series of events, one occurrence was involved insofar as each property owner was concerned. Notwithstanding, therefore, that the same causes may have operated upon several properties at the same time resulting in varying degrees of damage, it cannot be regarded as one occurrence, but the damage to each plaintiff is a separate occurrence.

18

*Id.* at 915-16.  Accordingly, the court held that the damage to each plaintiff's property constituted a separate occurrence under the terms of the policy, and the policy limit of $50,000 could be applied to each claim. *Id.* at 915. In cases in which the injuries at issue were discrete and occurred at different times, courts have followed the holding of *Lombard* and assessed the number of occurrences from the point of view of the people who experienced damage, *i.e.*, the effects, not the cause, of the occurrence. *See, e.g., Exxon Corp. v. St. Paul Fire & Marine Ins.*, 129 F.3d 781, 788 (5th Cir. 1997) (relying on *Lombard* to hold that exposure of five individuals to fumes while transporting sludge was five separate occurrences within meaning of policy); *Soc'y of Roman Catholic Church of Diocese v. Interstate Fire & Cas. Co.*, 26 F.3d 1359 (5th Cir. 1994) (damage to each child caused by repeated molestations of priests was separate occurrence); *cf. Washington v. McCauley*, 62 So.3d 173 (La. Ct. App. 2011) (distinguishing the facts of *Lombard* in holding that injuries that occurred nearly simultaneously due to truck's collision with two cars formed single occurrence) (collecting cases).

Despite Lexington's contention that the holding of *Lombard* is controlling here, the policy language that the Louisiana Supreme Court examined differs significantly from the Lexington policy terms at issue. As previously stated, in *Lombard*, the court construed a different provision, the bodily injury and

19

property damage provision, which defined "occurrence" as "an accident or a continuous or repeated exposure to conditions which results . . . in injury to person or real or tangible property which is accidentally caused." 284 So.2d at 915. The provision further stated, "All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence." *Id.* Here, the policy provision at issue is the personal and advertising injury coverage, which defines "occurrence" as:

> an offense arising out of your insured organization work that causes personal and advertising injury. All damages that arise from the same, related or repeated injurious material or act will be deemed to arise out of one occurrence, regardless of the frequency or repetition thereof, the number and kind of media used and the number of claimants.[37]

Thus, the language in Lexington's policy explicitly groups into one occurrence damages that arise from "the same, related or repeated injurious material or act . . . regardless of the frequency or repetition thereof, . . and the number of claimants."[38] The contractual language "regardless of the number of claimants," which did not appear in the *Lombard* policy, expressly provides for grouping the claims of individuals suffering damage from related acts into one occurrence. Moreover, the word "related" did not appear in the *Lombard* policy, and its

---

[37]  R. Doc. 33 at 3.

[38]  *Id.*

20

inclusion here impacts the Court's determination of what constitutes an occurrence. Thus, the *Lombard* holding does not compel the conclusion that each condemnation is a separate occurrence under the Lexington policies.

But more importantly, the Lexington policies state that the retained limit applies "separately to each and every occurrence . . . or *series of continuous, repeated, or related occurrences*."[39] (emphasis added). Thus, even if each condemnation were a separate occurrence, under the terms of the policies, a series of continuous, repeated, or related occurrences can have the same retained limit. Therefore, the issue here is whether the occurrences are continuous, repeated, or related. At a minimum, the Court finds them to be related.

Lexington's policies do not define the word "related." *Webster's New World College Dictionary* defines it as "connected or associated, as by origin or kind." (4th ed. 1999). Here, the St. Bernard Parish Council adopted a motion on January 22, 2008, wherein it condemned thousands of properties for failing to meet the requirements of the 2006 ordinance, including the properties of the state court plaintiffs. Although the resulting demolitions occurred at different times over the next year, they had their genesis in a single action by St. Bernard. The condemnation and demolition actions at issue therefore shared a common origin and

---

[39]    Exhs. 1 at 10; 2 at 10; 3 at 10.

were "connected or associated, by origin or kind." *See Webster's New World College Dictionary* (4th ed. 1999). Thus, the Court finds that the injuries produced by St. Bernard's condemnation of properties on January 22, 2008 are related under the terms of the policies.

Lexington points to no precedent in which the word "related" was narrowly construed and inconsistent with this interpretation. Moreover, in the cases cited by Lexington in which courts found that separate occurrences had taken place, the word "related" did not appear in the definition of occurrence. *See, e.g., Soc'y of Roman Catholic Church of Diocese*, 26 F.3d at 1363-64; *Reynolds v. Transcontinental Ins. Co.*, No. 94-1367, 1995 WL 16795, at *3 (E.D. La. Jan. 17, 1995). Additionally, Lexington's interpretation simply ignores critical language in the policies. The Lexington policies state that the retained limit "applies separately to each and every occurrence . . . *or series of continuous, repeated, or related occurrences.*"[40] (emphasis added). Lexington's interpretation of the policy language requires the Court to ignore the entire phrase, "or series of continuous, repeated, or related occurrences." This the Court may not do. *See, e.g., Lambert v. Maryland Cas. Co.*, 418 So. 2d 553, 560 (La. 1982) ("Some effect is to be given to every word or

---

[40]     Exhs. 1 at 1, 10; 2 at 1, 10; 3 at 1, 10.

clause if possible for a court may not impute to the parties the use of language without meaning or effect.").

Lexington does not present reasons why the injuries caused by St. Bernard are not related occurrences. That the word "related" is broad does not necessarily render it ambiguous. *See, e.g., Barron v. Scaife*, 535 So. 2d 830, 832-33 (La. Ct. App. 1988) (finding policy language excluding claims "arising from" or "related to" to be clear and unambiguous); *Allstate Ins. Co. v. Melton*, 482 F. Supp.2d 775, 785 (S.D. Miss. 2007) ("The fact that there can be varying degrees of relatedness does not make use of the phrase 'related to' ambiguous."). Lexington offers no interpretation of the phrase that does not conflict with the explicit terms of the policies. Moreover, to the extent that the word "related" is ambiguous, under Louisiana law, the policies must be interpreted in favor of coverage. *See Cadwallader*, 848 So.2d at 580. Accordingly, the Court finds that the condemnation and demolition activities authorized by St. Bernard on January 22, 2008 constitute a series of related occurrences for which a single retained limit applies. Thus, once St. Bernard exhausts the retained limit of $250,000 in litigating the state court suits, Lexington is obligated to provide coverage up to the limit of the policies.

**IV.   CONCLUSION**

For the foregoing reasons, it is the judgment of this Court that the St. Bernard Parish Government is entitled to coverage by the Lexington insurance policies for damages caused by St. Bernard as it carried out its 2006 ordinance through the condemnation and demolition of properties.


New Orleans, Louisiana, this 3rd day of January, 2013.

_____

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE